E. A. BOYL, Appellee, v. MIDLAND LYCEUM BUREAU, Appellant.

**Contracts:** EVIDENCE IN EXPLANATION OF AMBIGUITY. Where a contract is not intelligible to an ordinary person without the aid of extrinsic evidence, a letter written by one of the parties at the time of making the contract, purporting to be an interpretation of its meaning in some essential particular, was admissible in explanation of the ambiguity. In the instant case the letter in connection with the interpretation of the contract by the mutual acts of the parties is held to show that plaintiff was entitled to pay for one hundred lecture engagements as the minimum guaranteed number.

**Same:** BREACH: DAMAGES. Under a contract that a lecturer should receive no pay for an engagement which he failed to fill, the bureau was not entitled to damages because of such a failure, and for which he made no charge.

*Appeal from Polk District Court.—Hon. Hugh Brennan, Judge.*

Thursday, November 14, 1912.

Action upon a contract for services as a lecturer. There was a counterclaim for a·breach of the contract. Verdict and judgment for plaintiff, and defendant appeals. —*Affirmed.*

*S. B. Allen,* for appellant.

*A. W. Brett,* for appellee.

Evans, J.—The defendant appellant is a lecture bureau. The plaintiff was one of its lecturers for a period of five years. The contract between the parties was entered into in January, 1905. The headquarters of the bureau were in Des Moines. The residence of the plaintiff was Camden, N. Y. After some oral negotiations, a written contract was formulated at the home office and forwarded to the plaintiff, and was duly executed by both parties. Such contract was as follows:

Contract. By and between Midland Lyceum Bureau, Des Moines, Iowa, party of the first part, and Elliott A. Boyl, of Camden, New York, party of the second part, witnesseth: That said party of the first part does hereby agree to engage and does engage said second party for as much time as they may be able to use during the season beginning in October, 1905, in the capacity of lecturer. Limited to ———. Said first party agrees to pay said second party for said services the sum of seventy ($70.00) dollars per week (payable weekly), and all expenses; said expenses to mean railroad fares, necessary drives, bus and baggage transfers, hotel bills, beginning at Camden, New York, and ending at last date; credential rebates for clergy rate (if secured) to belong to said first party. First party agrees to furnish printing except 2,000 advance enamel

circulars and plates, cuts and designs for circulars and hangers. Witnesseth: That said second party does hereby agree to fill all bookings made for him on the dates assigned, and to report on Monday of each week, on blanks furnished by first party, the collections and disbursements (including his own salary) of the previous week up to and including Sunday, and to remit, with report, by draft or money order, the balance on hand. Said second party agrees to give six nights per week to the work, if so many should be required, and to take drives, night trains, and to endure other hardships where necessary. Second party agrees to follow railroad schedules furnished by first party and to depart from same only at his own risk, except in cases where a change of train time-tables shall render the schedules furnished first party inoperative, in which case he shall spare no effort to reach his date by any other route, or a long drive, if necessary. Second party agrees to pay all his expenses not named above, and to furnish or pay for 2,000 advance enamel circulars and plates, cuts and designs for circulars and hangers. Second party agrees to give first party exclusive control of his time from October 1, 1905, to October 1, 1906, and to give first party option on his time from October 1, 1906, to October 1, 1907, at $85.00 per week, same terms as above; also from October 1, 1907, to October 1, 1908, at $100.00 per week, same terms as above. Second party agrees to avoid making trouble at hotels or with committees or managers, the express understanding of this paragraph being that he shall be polite, agreeable and obliging at all times and endeavor to please both on and off the platform. (Second party also agrees that first party may cancel this contract for incompatibility, ill health, misconduct or unsatisfactory work) and where loss is sustained or rebates must be made to any committee because of his failure to please, said second party shall receive no salary for said engagement. It is mutually agreed that 'open dates' shall be borne by first party, but in any event no salary shall be paid when two or more engagements are missed due to blockades, washouts, epidemics, or other troubles where blame attaches to neither party, though first party shall pay all expenses of second party during that time; also any agreement by first party to take consecutive time does not apply to any time open between

December 15 and January 15, unless first party chooses to book said time, nor to any other period of one or more weeks in which no bookings occur, provided first party fills the guaranteed number of nights (or weeks), if any are guaranteed, between October 1 and May 1, of the season specified.   It is also agreed that second party shall collect, report, and remit as agent of the first party, and as such is liable for all funds passing through his hands.   It is also mutually agreed (that first party shall also have option on time of second party from October 1, 1908, to October 1, 1910, at $100.00 per week, same terms as above.   Also that second party shall be sold in a circuit as a regular circuit number).

At the time such contract was forwarded to the plaintiff for his signature, it was accompanied by the following letter known in the record as Exhibit B.

Des Moines, Iowa, Jan. 14, 1905.   Mr. Elliott A. Boyl, Camden, New York—Dear Mr. Boyl:   We inclose contract made out for five years as per our agreement with you when I saw you.   Will see what we can do with Waterloo and other assemblies and do all we can for you. I just returned home the 12th.   I wish to reiterate our statement that our seasons do not run less than 100 nights. The only guarantee that you need along this line is our agreement to sell you as regular circuit number which we are willing to do.   The only possibility of running less would come in case of an utter destruction of the Midland Bureau due to hard times or some great national calamity which would swamp us.   We think you will see the absurdity of such a supposition and will understand as the rest of our talent understands that the agreement to put you in a regular circuit is equivalent to guaranteeing you 100 nights or more.   We have talked over the matter of your doing agency work in Ohio and we are more than anxious to have you attempt it, feeling sure that you can make money and at very little risk of loss to yourself.   Will make you a proposition along that line in a very short time.   Best regards.

I.   The plaintiff entered upon the performance of the contract and continued for four successive years, concern-

ing which no controversy is presented. The defendant also exercised its option to demand the plaintiff's services for the fifth season beginning October, 1909. For that season, the defendant furnished the plaintiff seventy-eight engagements. It is the contention of plaintiff that under the contract he was entitled to a minimum limit of one hundred engagements. He brought this suit to recover compensation for the additional twenty-two nights claimed by him. It is the contention of defendant that it was bound to use plaintiff only for such engagements as it could secure, and not more, and that it could not secure more engagements for him than it did do for the last season, and that it terminated his contract on March 25, 1910. In support of his contention, the plaintiff introduced in evidence over the objection of defendant the letter (Exhibit B). He contends that it was a part of the written contract, or, at least, that it was an accepted interpretation thereof. The defendant contends that it was no part of the contract, and that it should not have been admitted in evidence, and the points relied on for reversal concentrate upon this letter.

*1. CONTRACTS: evidence in explanation of ambiguity.*

Turning now to the contract which is known in the record as Exhibit A and to the letter Exhibit B, we find them entirely consistent. Looking at the contract Exhibit A alone, it would not be intelligible to an ordinary person without the aid of extrinsic interpretation. The contract refers to a "guaranteed number of nights," but does not specify the number. It also contains the words "limited to ———." It also provides for an option to the defendant on the time of plaintiff "from October, 1908, to October 1st, 1910, at $100 per week same terms as above." It also provides that the plaintiff "shall be sold in a circuit as a regular circuit number." It also gives the defendant the exclusive control of the time of the plaintiff for the entire period covered at a stated compensation per week. Exhibit B only purports to be an interpretation of Exhibit A as

to what is meant by selling the plaintiff "as a regular circuit number." It is there stated that this "is equivalent to guaranteeing you one hundred nights or more." The proviso of Exhibit A thus interpreted does not on its face convey any definite meaning. It was clearly proper that the parties put an interpretation upon it. For four seasons the defendant furnished plaintiff one hundred engagements or more, except for the second season. For such season the engagements actually furnished were somewhat less than one hundred, but the plaintiff was compensated precisely as though the one hundred engagements had been furnished. We have then the written interpretation agreed on in advance of performance, and a subsequent interpretation by the mutual acts of the parties in the course of performance, from both of which it appears that the plaintiff was to receive a minimum wage as for one hundred engagements. We hold, therefore, that Exhibit B was clearly admissible. It is immaterial for the purpose of this case whether it should be deemed as a part of the contract or simply as an interpretation of its ambiguity. The real meaning of the terms used in Exhibit A could only be ascertained by resort to Exhibit B.

The appellant has specified a large number of points relied on for reversal, all of which bear directly upon the question now considered. Our conclusion thereon is quite decisive against the appellant upon the whole case.

II.   By way of counterclaim, the defendant pleaded damages for breach of contract. Two items were claimed. One of them was conceded and presents no controversy.

2. SAME: breach: damages. The other was an item for damages resulting to the defendant by reason of plaintiff's failure to fill a date at Alma, Neb. It is claimed that the failure resulted in damage to the defendant to the amount of $162. We can find no evidence in the record to show that plaintiff's failure to make the date at Alma, Neb., resulted through any fault of his own. Be that as it may,

the contract especially provides that, "where a loss is sustained," . . . "said second party shall receive no salary for said engagement." The plaintiff received no salary for the Alma engagement, and claimed none. He therefore met the full requirements of the contract in that regard.

The judgment below must be—*Affirmed.*